## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRISTOPHER FAILLA** ) | |
| **1781 NORTH ROUTE PARKWAY** ) | |
| **ST. AUGUSTINE, FL 32095** ) | |
| **(904) 382-4193** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | |
| ) | |
| **ARCHITECT OF THE CAPITOL** ) | |
| **SB- 15 U.S. Capitol Building** ) | |
| **Washington, DC 20515,** ) | |
| ) | |
| **Serve:** ) | |
| ) | |
| **Architect of the Capitol** ) | |
| **SB-15 US Capitol Building** ) | |
| **Washington, DC 20515,** ) | |
| ) | |
| **United States Attorney's Office** ) | |
| **for the District of Columbia,** ) | |
| **Attn: Civil Process Clerk** ) | |
| **555 4th St., NW** ) | |
| **Washington, DC 20530,** ) | |
| ) | |
| **Merrick B. Garland, Attorney General,** ) | |
| **950 Pennsylvania Avenue, NW** ) | |
| **Washington, DC 20530-0001,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## COMPLAINT FOR EQUITABLE AND MONETARY RELIEF

Plaintiff Christopher Failla brings this complaint against the Architect of the Capitol ("AOC") for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.* ("the Rehab Act"), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C.A. § 4311 *et seq.*, ("USERRA") as applied to the agency by the Congressional Accountability Act of 1995 ("CAA"), as amended by the CAA 1995 Reform Act of 2018. 2 U.S.C. § 1311 *et seq.*, when it subjected Failla to a hostile work environment and failed to accommodate his disability.

## PARTIES

1.      Plaintiff is domiciled in St. Augustine, FL and was employed by the AOC as its Inspector General ("IG"). He is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

2.      The AOC is the federal agency responsible for the maintenance, operation, development, and preservation of the United States Capitol Complex, with its headquarters located at SB-15 U.S. Capitol, U.S. Capitol Building, Washington, DC 20515. It is an "employer" as defined by 42 U.S.C. § 2000e and an "employing office" pursuant to the CAA at 2 U.S.C. § 1301(9)(D).

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Title VII, USERRA, the Rehab Act, and ADEA.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the

Defendant's headquarters are in this judicial district and the alleged violations took place in this judicial district.

## ADMINISTRATIVE EXHAUSTION

5.      Plaintiff filed his claims with the Office of Congressional Workplace Rights ("OCWR") on August 12, 2024. The OCWR issued Plaintiff a Notice of Right to File a Civil Action pursuant to 401(b) of the Congressional Accountability Act of 1995 (CAA), 2 U.S.C. § 1401(b).

6.      Plaintiff filed this action before the 70-day period passed.

## FACTUAL ALLEGATIONS

7.      The Architect of the Capitol Inspector General Act of 2007, Title 2 U.S.C. § 1808, established the Office of Inspector General for the AOC (AOC-OIG) as an independent office within the AOC.

8.      Congress created AOC-OIG in 2007 as an independent organization within the AOC in order to allow the AOC IG to conduct their duties of investigating and reporting on the AOC without fear of retaliation from the AOC.

9.      The Architect of the Capitol Inspector General Act of 2007 also applies sections of the Inspector General Act of 1978 to the AOC-OIG that detail the Inspector General's duties and established employee protections from retaliation for contacting the OIG or participating in OIG activities.

10.     The IG reports to and is under the general supervision of the Architect of the Capitol. However, as a means to protect the AOC-IG's independence, the Architect does not issue performance reviews or make decisions affecting the IG's remuneration.

11.     The AOC-OIG has roughly twenty-two employees and has no dedicated human

resources staff. The AOC-OIG depends on the AOC proper for human resources and other forms of logistical support. The AOC-OIG submits leave or reimbursement requests after internal review and approval to AOC's human resources office, which approves requests without objection.

12.     Under the Architect of the Capitol Inspector General Act of 2007 and the Inspector General Act of 1978, the AOC IG's duties are to investigate AOC programs and operations, review proposed legislation and regulations impacting the AOC through regular reports, recommend AOC policies, and keeping the AOC and Congress informed about any problems or deficiencies related to AOC administration through regular hearings and reports.

13.     All of the foregoing AOC-IG duties relate to the AOC-IG's overall role of preventing corruption, fraud, abuse, and inefficiency.

14.     Failla is a 55-year-old white male residing in St. Augustine, FL. He served in the Navy for 26 years, retiring in 2017 as a Captain. The Department of Veterans Affairs rated Failla as 100% disabled by due to multiple service-related conditions resulting in mobility issues.

15.     The AOC appointed Failla to the position of Inspector General in or about April of 2017. Failla met on a regular basis with the Architect of the Capitol in this role, and Failla worked with Architect of the Capitol Stephen Ayers until 2018 when he was replaced by Acting Architect Christine Merdon. In or about January 2020, Brett Blanton was appointed Architect.

16.     Failla also regularly met and worked with the chief administrative officer, William O'Donnell, the general counsel, Jason Baltimore, the chief financial officer, Johnathan Kraft, the chief of staff, Peter Bahm, and the chief engineer, Chere Rexroat.

17.     As part of his duties and responsibilities, Failla served as the Architect's principal spokesperson on fraud, abuse, and cost-savings matters before Congress, other agencies and the

public and was in frequent communication with house and senate staffers whose roles included

funding appropriations for the AOC budget and congressional oversight.

18.     Failla performed well throughout his tenure as AOC-IG, earning praise from

Congress and earning awards from the Counsel of Inspectors General for Integrity and

Efficiency ("CIGIE") for his work.


### The AOC Hires Christine Leonard

19.     In or about November 2020, the AOC hired Christine Leonard as its director of

legislative and public affairs ("LPA").

20.     The LPA director position is influential as it allows for one person to manage both

public communications as well as communications with staffers for the Senate Committee on

Rules & Administration and the House Committee on House Administration, which typically

make decisions for the AOC that the Architect usually must follow. The director of legislative

and public affairs meets daily with the Architect.

21.     During the onboarding process Leonard asked one of her reports, Erin Courtney,

why the AOC employed so many military veterans, and Courtney replied that the Office of

Personnel Management favors veterans in the hiring process and that many military veterans

possess the prerequisite skills for many AOC positions.

22.     Leonard regularly and critically declared to Courtney that she believed there were

too many male veterans in executive positions at the AOC after Courtney began reporting to

Leonard.

23.     Leonard also regularly complained to Mary Jean Pajak, the AOC's deputy chief

of staff, about Baltimore, Kraft, and O'Donnell, criticizing their use of military language and

opining that they engaged in "mansplaining" during work meetings.

24.     Complaints against Leonard by her reports began as soon as she began as LPA. Multiple employees alleged that Leonard had discriminated against them on multiple bases, particularly on the basis of sex. Leonard resented men in positions of authority above her in rank and routinely demeaned women who served under her.

25.     In or about January of 2022, an AOC employee filed an OCWR complaint against AOC, alleging that Leonard discriminated against her on multiple bases, including gender. In or about May of 2022, an anonymous review of AOC as an employer on the website Glassdoor accused Leonard of, among other complaints, discriminating against her female reports.

### AOC-OIG Moves to Remote Work

26.     In March of 2020, because of the COVID-19 pandemic, the AOC, including AOC-OIG, moved most of its workers to working remotely.

27.     Failla and his employees continued to perform at a high level while working remotely, and they continued to earn praise from Congress and the Agency for their increased productivity.

28.     Failla's disability-related mobility issues worsened while he worked remotely, resulting in increasingly severe mobility issues.

29.     Congress increased funding and staffing for the Capitol Police Department ("CPD") in the wake of the January 6, 2021, attack on the Capitol.

30.     Failla and Blanton agreed to keep AOC-OIG in a remote work posture between January 2021 and February 2022 and to give up AOC-OIG's office space towards a combination of space for CPD and shared office space that the few remaining in-person AOC-OIG investigators could use. In or about February of 2022 Blanton formalized a fulltime telework

policy for the entire Agency, and Congress praised the plan because of its cost-savings (approximately $110,000 per year (for Failla's OIG alone).

31.     Blanton gave Failla approval to work remotely on a permanent basis as a part of this policy change, including Failla's plan to move away from the Washington, DC area.

32.     Failla did not disclose to Blanton or the Agency that he was disabled because he wished to keep his disability private and because he was able to continue performing well as AOC-IG so long as he continued to work remotely.

### AOC-OIG Investigates Blanton

33.     Failla and AOC-OIG began to receive referrals in or about mid 2021 alleging that Blanton misused the vehicle he had been given as a part of his employment as Architect.

34.     Failla and his employees uncovered evidence over the course of an 18-month investigation pursued almost entirely remotely that Blanton and his family used his federal vehicle for private purposes.

35.     In or about November of 2022 Failla released a report on Blanton's ethical and legal violations related to his vehicle. No action was taken against Blanton.

36.     In or around December 2022 Failla directed his counsel at AOC-OIG, Sally Smith, to draft a remote work policy for AOC-OIG that mirrored AOC's February 2022 policy when he became concerned that Blanton could retaliate against him and his office.

37.     Failla also began to move decision-making for routine travel and leave requests from AOC itself AOC-OIG's legal and ethics officers to preserve AOC-OIG's independence and to protect it from any potential retaliation from Blanton.

38.     However, on or about February 13, 2023, President Joe Biden fired Blanton because of Failla's and AOC-OIG's work, and Failla earned recognition for the report he issued

leading to Blanton being held accountable for his legal and ethical violations. Failla's report led to the recovery of approximately $14,000 in funds from Blanton's pay.

39.     On or about March 3, 2023, Failla published a Management Advisory ("MA") stating that 17 AOC employees had potential knowledge of Blanton's violations but had failed to notify AOC-OIG, a violation of AOC 40-1 Policy. Failla did not include the names of the 17 employees.

40.     Failla's recommended enforcement action was to inform all SR AOC employees to be more vigilant about identifying potential violations in the future. Failla did not recommend any kind of disciplinary action against these employees.

**Rexroat Becomes Acting Architect**

41.     Rexroat was named acting architect in or about March 2023.

42.     Rexroat ceased communicating with Kraft, O'Donnell, Baltimore, and Bahm upon starting her role as acting architect, and she began working more closely with Leonard as well as the congressional staffers for the Senate Committee on Rules & Administration and the House Committee on House Administration.

43.     Failla began to receive complaints in or about the spring of 2023 from AOC employees regarding Rexroat's behavior. Specifically, Failla received complaints that, under Rexroat's leadership, Senate Staffer Nicole Kotschwar and House Staffer Patrick Briggs began to sit in on AOC meetings and set up offices within the AOC, causing separation of powers issues. Failla also received complaints from AOC employees that Rexroat was creating a hostile work environment and violating AOC policies, including utilizing funds improperly. Laura McConnell, Director of the Diversity Inclusion and Dispute Resolution Office, notified Rexroat that she (McConnell) was referring complaints she received about Rexroat to Failla's office for

investigation. McConnell also conducted her own investigation into claims that alleged Rexroat created a toxic work environment, this investigation took place on July 5, 2023.

44.     Rexroat and senate staffers Nicole Kotchwar and Kristin Mollet asked Failla to open an investigation into Baltimore's remote telework arrangement in February 2023. Failla declined to investigate this matter and pointed out to the three that Baltimore's remote telework arrangement appeared to be compliant with the AOC's February 2022 fulltime telework policy. This telework agreement was previously approved by the AOC.

45.     Kotchwar had at times also asked Failla to investigate Bahm, as she often implied that Bahm does not do any work. Because Kotchwar did not provide any specific allegations, Failla declined these requests as baseless.

46.     Kotchwar and Mollet often asked the OIG to investigate the 17 employees who had failed to warn Failla about Blanton's behavior. Failla informed Kotchwar and Mollet that he would provide a management advisory ("MA") to Rexroat asking for retraining on AOC Order 40-1 compliance, which requires employees to report suspected complaints and violations to the AOC OIG.

47.     Baltimore contacted Failla and asked him to arrange a training session on AOC Order 40-1 compliance and responsibilities. Failla provided this training to SRs on April 14, 2023. During this training, Leonard questioned Failla on the AOC Order 40-1 and asked what "punishment they would get if they violated it." Failla told Leonard that the AOC does not specify that a violation of this order requires a punishment. Failla also stated that that the Architect is the punishing authority, not him (Failla).

48.     In early April 2023, Rexroat asked Failla to identify for her the 17 employees who had failed to warn him about Blanton's behavior, and after he complied, Rexroat informed Failla

on or about April 6, 2023, that she fired (offered retirement, termination or resignation) Kraft, Baltimore, O'Donnell, and Bahm, along with another SR over a different substantiated investigation into her behavior.

49.     Failla noted that Rexroat terminated four out of five of the executive-level, older veteran men members of the AOC C-Suite. Three out of the four are white, three out of the four are veterans, and all are men over 40 years old. The fifth male executive who had not been fired had only been hired a month prior.

50.     The remaining four female executives were not terminated, including chief security officer Val Hasberry, who Failla had directly implicated in the list of 17 employees he gave Rexroat. Hasberry was also named in the Blanton report of investigation. Failla felt Hasberry encouraged Blanton's bad behavior even after Hasberry's own employees raised concerns over funding for the vehicle being supported by OCSO.

51.     Upon information and belief, Leonard and the congressional staffers influenced Rexroat's decision.

52.     On April 6, 2023, Rexroat called Failla and told him that she did not need a reason for firing Kraft, Baltimore, O'Donnell, and Bahm as they served at the Architect's pleasure. Rexroat then stated that Failla also served at her pleasure as a SR. Worried that he was next to be fired as an older white male veteran, Failla informed Rexroat that he did not serve at her pleasure because of the independence of his office within the AOC he was different than the other SRs Rexroat then asked questions about how she would go about firing the AOC-IG, and Rexroat took notes when Failla explained the procedures and guidance to her that required notification to Congress 30 days prior to removal or transfer along with requiring substantial reasoning for removal.

53.     O'Donnell opted to retire rather than be terminated and his former employees in the chief administrative officer's office threw an informal retirement party for him. In response, Rexroat filed a complaint with Failla's office to investigate O'Donnell and his former employees for gifts violations. Failla dismissed the investigation into O'Donnell and his former employees because the investigators who triaged the complaint found that the allegations were unfounded.

54.     In Rexroat's first townhall event with all AOC employees, Rexroat implied that Failla was responsible for the terminations that took place on April 6, 2023, causing a chilling effect among the AOC staff and ability for Failla to do proper oversight. One SR asked Rexroat who is next on the Failla's "hit list." Failla believes this SR did not know he (Failla) was on the call.

<b>Hostile Work Environment</b>

55.     AOC-OIG finalized and published its fulltime telework policy in early May 2023.

56.     That same month Rexroat revoked AOC's February 2022 telework policy, reverting to pre-pandemic rules and requiring many AOC employees to return for in-person work. AOC-OIG workers were unaffected, but Rexroat began to direct AOC employees to reject Failla's travel and leave requests, preventing Failla from attending a scheduled medical appointment and initially refusing to allow Failla to attend a yearly Counsel of Inspector Generals' Symposium. Rexroat also refused to change Failla's duty station to reflect that he had moved out of his home in Virginia on March 17th, months before she revoked the telework policy, preventing him from making unilateral travel decisions to get important training needed for his office to pass peer reviews and not be shut down from doing their work.

57.     At the same time, AOC-OIG began investigating multiple complaints that Rexroat had refused to change duty stations for other AOC workers, resulting in their being paid more

than they should be according to their locality – resulting in at least $115,000 of wasted funds and a potential ongoing Anti-Deficiency Act violation. This referral of investigations into her were provided to Rexroat by the Diversity Inclusion and Dispute Resolution Office ("DI/DR") personnel who referred the allegations to the OIG thus tipping Rexroat off she was under investigation and creating even hostility directed at Failla.

58.    On or about May 15, 2023, Failla informed Rexroat that he would no longer route as many administrative decisions through to AOC, opting to give decision-making power to AOC-OIG's ethics and legal officer on the advice from the Small OIG Counsel of Inspector Generals as a way their small offices who are dependent upon Agency HR conduct IG approvals. Rexroat told Failla to inform Congress, and Failla did so. Following informing Congress, AOC OIG ethics and legal officer was given approval authorities. Failla refiled all approvals for remote work, travel, training, leave, and time and attendance to AOC OIG's ethics and legal officer for approval and was provided. The ethics and legal officer also approved Failla's remote work. Failla has been working remotely in Saint Augustine Florida as of August 1, 2023.

59.    On or about July 6, 2023, Failla met with house and senate staffers regarding the independence of his office. Instead, the staffers assailed Failla for not walking the halls of the Capitol in-person, implying that he was a building inspector rather than an auditor for the AOC. Failla explained that his position required no physical presence in the Capitol and that he was able to accomplish his duties remotely.

60.    The staffers then invoked Failla's veteran and disability status and implied that he could not work as IG due to his disability.

61.    Realizing that the Agency unlawfully revealed his disability status to Congress to undermine him, Failla filed an OCWR complaint on July 13, 2023, alleging that the Agency

sought to use his disability status against him.

62.    In or about October of 2023, Failla discovered that his travel for training to obtain his Certified Fraud Examiner qualification reimbursement was not being processed, this reimbursement was months late and amounted to over $2500. On Dec 22, 2023, the President of the United States signed the FY 2024 National Defense Authorization Act ("NDAA"). Included in NDAA was the Architect of the Capitol Appointment Act of 2023. This Act removed the appointment of the Architect of the Capitol by the President of the United States, it states the following:

> The Architect of the Capitol shall be appointed, without regard to political affiliation and solely on the basis of fitness to perform the duties of the office, upon a majority vote of a congressional commission (referred to in this section as the ''commission'') consisting of the Speaker of the House of Representatives, the majority leader of the Senate, the minority leaders of the House of Representatives and Senate, the chair and ranking minority member of the Committee on Appropriations of the House of Representatives, the chairman and ranking minority member of the Committee on Appropriations of the Senate, the chair and ranking minority member of the Committee on House Administration of the House of Representatives, and the chairman and ranking minority member of the Committee on Rules and Administration of the Senate.

63.    The Architect of the Capitol is no longer considered a Presidential appointee or a Political appointee.

64.    Per §1802, the compensation of the Architect of the Capitol shall be at an annual rate which is equal to the annual rate of basic pay for level II of the Executive Schedule under title 5, § 5313.

65.    Per §1808, the Inspector General of the Architect of the Capitol shall be paid at an annual rate of pay equal to $1,500 less than the annual rate of pay of the Architect of the Capitol.

66.    OPM Salary Table No. 2024-EX Rates of Basic Pay for the Executive Schedule (EX) Effective January 2024 Level II is $221,900.

67. Failla requested a change to his frozen salary based on the foregoing revision to the NDAA to the amount $220,400 on Jan 9, 2024, but his request was ignored without a reply from HCMD or Payroll contributing to further harassment at the direction of Rexroat. Failla's pay was not adjusted and his travel was not reimbursed until Rexroat left her role in February of 2024. At this time, Failla received apologies from HCMD staff who were told that Rexroat had held up the approvals to pay him.

**Threatened with Termination**

68. On or about November 7, 2023, Rexroat issued a new telework policy severely restricting telework at the AOC. Rexroat's new telework policy was implemented unlawfully, bypassing approval and comment by the AOC-OIG.

69. Rexroat's policy also claimed to apply to statutory employees and AOC-OIG employees, violating AOC-OIG's independence and its own telework policy.

70. On November 8, 2023, the Inspector General Integrity Committee sent Failla a letter informing him that Rexroat had accused Failla of misconduct, alleging that the AOC-OIG's telework policy presented a conflict of interest in its investigations regarding complaints against AOC's implementation of its new telework policy and remote worker complaints as well as carrying out a request from Senate Ernst's office for OIGs to investigate remote workers' locality pay adjustments (Failla was not included in this investigation request since he does not receive locality pay.)

71. Failla also received a complaint that the AOC had illegally misused funds to fund a private study determining AOC employee eligibility for telework. The list of employees evaluated for potential telework eligibility, which included just one AOC-OIG employee, did not include Failla, making his ineligibility for remote work pre-determined.

14

72.     On or about November 14, 2023, Rexroat informed Failla that he was required to work in-person and that he would be terminated if he did not report to the AOC in-person by March 4, 2024, and Failla informed Rexroat and the Agency in response that he would not be able to perform his duties in person due to his disability. He also filed a request for reasonable accommodation under the Rehabilitation Act based upon his disabilities, requesting fulltime telework.

73.     Upon information and belief, Leonard and the congressional staffers, or others at or associated with AOC, leaked information about Failla's employment situation to multiple local publications, such as Roll Call.

74.     On December 6, 2023, Roll Call published an article called "Architect of Capitol calls its watchdog back to the office." This article is about how Failla works remotely from Florida. This article stated details about Failla's employment situation, such as, "The Architect of the Capitol's watchdog . . . has been told he will be fired if he doesn't start working on Capitol Hill by March."

75.     On December 15, 2023, Failla responded to the Integrity Committee's Request for Response regarding Rexroat's allegations about the AOC-OIG's telework policy.

76.     On January 24, 2024, the Integrity Committee decided to close its inquiry into the complaint against Failla based on its review of the allegations and Failla's response and supporting documents. The committee did not find that Failla had done anything wrong.

**Failla's Reasonable Accommodation**

77.     In or around December 2023, Failla asked Rexroat to delay or grant a stay of the March 4, 2024, deadline for him to return so that the reasonable accommodation interactive process would play out. However, Rexroat did not respond to this request.

78.     On January 10, 2024, Failla submitted a reasonable accommodation request to telework fulltime. With his reasonable accommodation request, Failla provided a medical letter from his provider that recommended Failla telework and a summary of benefits letter from the Department of Veterans Affairs that Failla has a 100% disability rating.

79.     On February 9, 2024, the AOC requested further medical documentation from Failla's medical provider.

80.     On February 12, 2024, Failla's medical provider gave the AOC a letter detailing Failla's medical conditions, work limitations, and the frequency of Failla's medical appointments.

81.     On March 7, 2024, the AOC asked Failla to obtain additional information from his medical provider and sent Failla's medical provider a letter with additional questions.

82.     On or around March 31, 2024, Failla's medical provider provided a letter with additional information and clarifications about Failla's medical conditions per the AOC's request. Failla provided the AOC with this letter.

**Rexroat Stepped Down as the AOC**

83.     In or around January 2024, Failla asked Rexroat to delay or grant a stay of the March 4, 2024, deadline for him to return so that the reasonable accommodation interactive process would play out. However, Rexroat still did not respond this request.

84.     In or around February 2024, Rexroat stepped down from her position as the AOC.

85. Joe Di Petro, Chief of Operations, took over after Rexroat stepped down. Di Petro granted a stay in Failla's March 4, 2024, return to office deadline and Di Petro approved Failla's pay increase and Failla's travel reimbursement. Di Petro decided to wait for the newly appointed Architect to decide on Failla's reasonable accommodation request and general supervision.

86. In or around June 2024, the AOC hired Thomas Austin to be the new Architect of the Capitol.

87. Austin requested an in-person meeting with Failla.

88. On July 8, 2024, Failla met with Austin and DiPetro. During this meeting, Austin told Failla that since he (Austin) is the new Architect of the Capitol, that Failla serves at his pleasure as the other SRs and that Austin can have Failla removed from his position as the AOC's Inspector General with 30 days' notice to committees without reason. Austin read from the AOC IG Act stating that Failla reports to him and that Austin is taking control of Failla's time, attendance, travel, training, and leave. Austin said that he had his marching orders and Austin told Failla that he wants Failla back in the office fulltime and that he would be making a decision on Failla's reasonable accommodation request quickly.

89. On July 9, 2024, Failla sent Austin and McConnell an email raising his concern that Austin and the AOC was threatening to remove Failla from his job and deny his reasonable accommodation request. In this email, Failla also stated his concern that Austin and the AOC was retaliating against him for disclosing his disability and requesting a reasonable accommodation.

90. On July 15, 2024, Failla learned that Austin has not approved his sick time or leave requests. After numerous calls and emails to the AOC c-suite, Failla was able to get his time approved.

**The AOC Issues Failla a Response to his RA Request**

91.     On July 26, 2024, Failla received a letter from the Diversity, Inclusion, and

Dispute Resolution Office regarding Failla's reasonable accommodation request. This letter

states that, ". . . the Architect has approved reasonable accommodation for a period of 60 days . .

. (1) You may work one work week of each pay period from your remote work site. You will

report to the Capitol Campus for the other work week of each pay period to allow you to perform

your in-person essential functions . . . (2) you will be on campus for any unscheduled

requirements that may arise." The accommodation period is from July 28, 2024, to September

26, 2024. This alternative accommodation effectively acts as a denial of Failla's reasonable

accommodation request to telework.

92.     In its July 26, 2024, letter, the AOC cited job responsibilities and stated that these

responsibilities are "essential functions" of Failla's job that "require[s] [Failla's] presence on the

Capitol Campus."  These job responsibilities that the AOC is citing are not listed in Failla's

position description.

93.     For example, the AOC stated that Failla's job responsibilities includes

"Personally inspect job sites, the status of office buildings, the state of campus grounds, and

observe employee compliance with agency regulations . . . ." Failla's job as an IG does not

require him to personally inspect buildings, the grounds, or any other areas that would take him

away from his office. Failla is not a building inspector; the Chief Engineer has the appropriate

background and training and is responsible for this type of work.

94.     The AOC also stated that part of Failla's job responsibility is to "Conduct in-

person meetings . . . Conduct in-person briefings with the Architect and other staff . . . ." In the

seventeen (17) years of the office's existence, there has never been a requirement that the IG

must meet with AOC Congressional oversight or the Architect. About seven (7) years ago, Failla initiated monthly meetings as a means to provide the Architect and Congress fully informed. The Majority of other IGs do this only through a Semi-Annual report. The meetings Failla set up have been a hybrid – some have taken place in person, video conference, or over telephone conferences to allow flexibilities for all involved at the request of all involved.

95.     Further, Failla has a staff who provide him with the results of audits, investigations, and any evaluations and discuss their findings with Failla on a weekly basis.

96.     Failla's position description as an IG (Agency position no. SA0759) state that he is responsible for ". . . providing leadership and coordination in recommending policies designed to promote economy, efficiency, and effectiveness in the administration of activities that serve Congress." According to Failla's position description, the IG's major job duties include leadership and managerial responsibilities; management of audits and investigations; and program advice, guidance and reporting. Failla is responsible for "managing staff," "perform[ing] administrative and technical supervisory functions for subordinates," "over[seeing] the audit and investigative functions of the AOC," "plan[ning] and direct[ing] AOC audit activities and set[ting] policy to ensure completion of audits."

97.     On July 29, 2024, Failla sent the AOC a response to its July 26, 2024, letter. He explained that the duties listed in its letter are not duties included in the IG position description. Failla also raised concerns that this letter is a further act of retaliation and discrimination. Failla further requested that the AOC reconsider its response to his reasonable accommodation request and work collaboratively with Failla to find a solution that will allow Failla to continue working towards the AOC's mission without exacerbating his health.

98.     Failla has been following the requirements of his temporary reasonable

accommodation and has been working in DC for one week each pay period. Failla worked in the DC office from August 3, 2024, to August 8, 2024. On August 8, 2024, Failla was preparing to leave for the day to go back to Florida. A secretary told Failla that Austin was planning on stopping by Failla's office in 15 minutes for an unscheduled meeting. This meeting was unscheduled. Austin got to Failla's office an hour later. Austin made small talk with Failla, looked around the OIG office, and left.

99.     Austin is also requiring Failla to attend meetings in-person, this includes entrance and exit conferences as well as the AOC's monthly meeting. These meetings had been done virtually for five years under the past four acting Architects and Blanton.

100.     Austin sent an email on August 14, 2024, stating that his preference and expectation is for one-on-one meetings with him, senior staff meetings, or larger gatherings such as entry/exit conferences with the OIG to be done in-person.

101.     Despite this email and Austin's expectation for in-person meetings, the senior staff meetings are virtual, and Austin does not attend.

102.     Other meetings with SRs are the OIG are virtual since it is a burden for these principles to attend meetings in-person.

103.     Austin rescheduled an entrance conference with the OIG for October 2, 2024. Failla had received prior approval from Austin to complete training and get CPEs in contract and procurement fraud on this date. During the meeting, Austin questioned Failla's staff about why Failla was not able to attend this meeting. Failla's staff informed Austin that Failla was completing a class for the training that Austin had approved.

104.     In contrast, there was an exit conference regarding the Construction Division audit. Failla was present as well as the contractors and auditor. The principles from the Office of

Chief Engineer, Chere Rexroat and her deputy, did not attend this meeting in-person. Austin did not inquire into why Rexroat or her deputy did not attend the meeting in-person.

105. On September 1, 2024, Failla's office received another complaint about Chief Engineer Rexroat. The complaint stated that "[Rexroat] was consistently out of the office on TW and falling short of the number of days in the office that she requires of other employees per her directive, and she does not engage with her employees." Failla learned that Rexroat has reasonable accommodation and is in the process of reapplying for telework. One of Rexroat's job duties as Chief Engineer is to inspect buildings.

As the result of AOC's illegal actions, Failla sustained mental anguish and economic damages, and he will continue to sustain damages into the future.

## COUNT I
**Discrimination Based on Race**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 1311**

106. Failla hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

107. Failla is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

108. Failla is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

109. The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

110. The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

111. The AOC illegally discriminated against Failla, based on his race, when it failed to engage in the interactive reasonable accommodation process, denied Failla's reasonable accommodation, threatened to fire him, and altered Failla's job duties and responsibilities.

112.     The AOC implemented adverse employment actions against Failla and several other white executives, including Kraft, Bahm, and O'Donnell. Rexroat implied that she could do to Failla what she did to Kraft, Bahm, and O'Donnell.

113.     The AOC's stated reasons denying Failla's reasonable accommodation Failla is pretext for its unlawful race discrimination.

114.     Failla sustained monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT II**
**Discrimination Based on Sex**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 1311**

115.     Failla hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

116.     Failla is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

117.     Failla is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

118.     The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

119.     The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

120.     The AOC illegally discriminated against Failla, based on his sex, when it when it failed to engage in the interactive reasonable accommodation process, denied Failla's reasonable accommodation, and altered Failla's job duties and responsibilities. The AOC also discriminated against Failla based on his sex when it allowed Rexroat to telework, but requires Failla to work in-person.

121.     Failla is one of several male executives who were discriminated against by the

AOC. The other males executives include Kraft, Baltimore, O'Donnell, and Bahm. Rexroat implied to Failla that he served at her pleasure and that she could act against him the way she did with Kraft, Baltimore, O'Donnell, and Bahm.

122.    Leonard, who helped Rexroat make major decisions at AOC, demonstrated animus against men.

123.    The AOC's stated reasons for failing to accommodate Failla are pretext for its unlawful sex discrimination.

124.    Failla sustained monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT III**
**USERRA**
**38 U.S.C. § 4311(a)**
**Discrimination**

125.    Failla hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

126.    Failla performed service in the United States Navy.

127.    AOC was motivated by the fact that he had served in the United States Navy when it discriminated against Failla and failed to accommodate him.

128.    Failla lost a benefit of employment when AOC failed to engage in the interactive reasonable accommodation process, denied Failla's reasonable accommodation, and altered Failla's job duties and responsibilities.

129.    Failla's former membership in a uniformed service of the United States was a substantial or motivating factor in AOC's decision to act against Failla.

130.    Failla is one of several veteran executives recently discriminated against by the AOC, including Kraft, Baltimore, and O'Donnell.

131.    Leonard, who helped Rexroat make major decisions at AOC, had demonstrated animus against veterans.

132.    Failla sustained monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT IV**
**The Age Discrimination in Employment Act**
**29 U.S.C. §§ 621 et seq.**
**Discrimination**

133.    Failla hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

134.    Failla is over 40 years old.

135.    The ADEA makes it unlawful for an employer discriminate against an employee on the basis of being over 40 years old.

136.    AOC's decision to discriminate against Failla was based on his age.

137.    Failla is one of several older executives recently discriminated against by the AOC, including Kraft, Baltimore, O'Donnell, and Bahm. Rexroat implied to Failla that she could act against him the way she had against Kraft, Baltimore, O'Donnell, and Bahm.

138.    AOC's stated reasons for its action are pretextual.

139.    Failla sustained monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT V**
**Discrimination Based on Disability**
**in Violation of the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.***

140.   Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

141.   The Agency unlawfully discriminated against Plaintiff on the basis of his disability.

142.   The Rehabilitation Act forbids federal agencies from engaging in any discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA). 29 U.S.C. § 791(g).

143.   The Rehabilitation Act makes it unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment because of his disability.

144.   Plaintiff is a disabled individual under the Rehabilitation Act as he has a 100% disability rating as determined by the United States Department of Veterans Affairs.

145.   Plaintiff is a qualified individual under the meaning of the statute. He was a longtime employee who had no attendance or performance issues.

146.   The Agency discriminated against Plaintiff when it used information in Plaintiff's employee file to leak information regarding his disability to third party congressional and senate staffers, allowing them to imply that he could not perform his duties while disabled.

147.   The Agency thus has knowledge of Plaintiff's disability status.

148.   The Agency discriminated against Plaintiff when it failed to engage in the interactive reasonable accommodation process, denied Failla's reasonable accommodation, and altered Failla's job duties and responsibilities.

149.    Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

150.    As a result of The Agency's violations of the Rehabilitation Act, Plaintiff has suffered mental anguish and economic damages, and he will continue to suffer damages into the future.

**COUNT VI**
**Failure to Accommodate**
**in Violation of the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.***

151.    Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

152.    The Agency unlawfully failed to accommodate Plaintiff's disability.

153.    An employer violates an employee's rights under the Rehabilitation Act by refusing to provide reasonable accommodations for a disability. See 29 U.S.C. § 791(g); 42 U.S.C. § 12112(a), (b)(5).

154.    The Rehabilitation Act makes it unlawful for an employer to fail to make reasonable accommodations for an employee with a disability who is able to perform the essential functions of the position.

155.    Plaintiff is a disabled individual under the Rehabilitation Act.

156.    Plaintiff is a qualified individual under the meaning of the statute.

157.    The Agency failed to accommodate Plaintiff's reasonable accommodation request.

158.    Despite Failla's diligent efforts to provide the AOC with medical documentation and additional information requested by the AOC, the AOC to date has not made a decision on Failla's reasonable accommodation request. Having to work in the office exacerbates Failla's

medical conditions.

159.     As a result of the Agency's violation, Plaintiff has suffered mental anguish and other economic and compensatory damages, and he will continue to suffer these damages into the future.

**COUNT VII**
**Retaliation**
**in Violation of the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.***

160.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

161.     The Agency unlawfully retaliated against Plaintiff for his protected activity.

162.     Section 504 of the Retaliation Act prohibits retaliation against those who seek to exercise their rights under the Rehabilitation Act – most notably alleging discrimination based on disability.

163.     Plaintiff is a disabled individual under the Rehabilitation Act.

164.     Plaintiff is a qualified individual under the meaning of the statute.

165.     Plaintiff exercised protected activity when he filed an OCWR complaint alleging that the Agency had leaked his disability to house and senate staffers, allowing them to question his ability to perform his duties.

166.     The Agency, in response, subjected Plaintiff to a hostile work environment, discriminated against him, and failed to accommodate him.

167.     As a result of the Agency's violation, Plaintiff has suffered mental anguish and other economic and compensatory damage, and he will continue to suffer these damages into the future.

## **PRAYER FOR RELIEF**

Based on the foregoing, Failla respectfully requests that he be awarded the following

relief against the AOC:

a.       Compensatory damages, including but not limited to pain and suffering,

emotional distress and reputational damage;

b.       Injunctive and declaratory relief;

c.       Reasonable costs and experts' and attorneys' fees; and

d.       Any other such relief that a court may deem just and equitable.

Respectfully submitted,

*/s/ Austin Ray Szabo*
Austin Ray Szabo, DC 90009495
R. Scott Oswald, DC 458859
Anita Mazumdar Chambers, DC 1046845
The Employment Law Group, P.C.
1717 K St. NW, NW, Ste. 1110
Washington, DC  20006
(202) 609-8378
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
aszabo@employmentlawgroup.com
*Counsel for Christopher Failla*