**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CHRISTOPHER FAILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-2943 (ABJ) |
| | ) | |
| ARCHITECT OF THE CAPITOL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Failla brought this action against his former employer, the Architect of the Capitol, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Uniform Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311 *et seq.* Compl. [Dkt. # 1] at 2; Am. Compl. [Dkt. # 3] at 2. The Architect of the Capitol ("AOC")[1] is an agency under the legislative branch that is "responsible for the maintenance, operation, development, and preservation of the United States Capitol Complex." Am. Compl. ¶ 2.

Plaintiff filed his initial complaint on October 17, 2024, and before it was served, he filed an amended complaint on December 20, 2024. *See* Compl.; Am. Compl. On May 2, 2025, defendant filed a partial motion to dismiss the amended complaint. Def.'s Partial Mot. to Dismiss

---

1    The Court will refer to the agency as the "AOC." The individual official who is the head of the agency will be referred to as "the Architect."

1

[Dkt. # 14] ("Mot."). The motion is fully briefed. *See* Pl.'s Mem. in Opp. to Mot. [Dkt. # 15] ("Opp."); Def.'s Reply in Further Supp. of Mot. [Dkt. # 16] ("Reply").

For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**. The Court emphasizes at the outset that the partial nature of the motion and the ruling means that some portion of this lawsuit will be moving forward.

## BACKGROUND

Plaintiff is a 55-year-old white male who served in the United States Navy for twenty-six years until he retired as a captain in 2017. Am. Compl. ¶ 17. At some point, the Department of Veteran Affairs "rated [him] as 100% disabled due to multiple service-related conditions resulting in mobility issues." Am. Compl. ¶ 17.

Failla began working for the Architect of the Capitol in 2017, when he was appointed to be the AOC's Inspector General. Am. Compl. ¶ 18. The Office of the Inspector General of the AOC ("AOC-OIG")[2] is an independent office within the AOC that investigates agency programs and operations, reviews proposed legislation and regulations, recommends policy, and keeps Congress informed about any problems or deficiencies related to the agency. Am. Compl. ¶¶ 10, 15. Plaintiff alleges that the Inspector General reports to the head of the AOC, the "Architect," and acts as his "principal spokesperson on fraud, abuse, and cost-savings matters." Am. Compl. ¶¶ 18, 20.

The 190-paragraph amended complaint is an extremely detailed account of plaintiff's seven-year tenure at the AOC. He includes historical facts concerning numerous individuals who were no longer at the agency in 2024 when the question of his ability to telework came to a head,

---

2       The Court will refer to the AOC's Office of the Inspector General as "AOC-OIG," and it will refer to plaintiff's position as the "Inspector General."

and he was terminated.  The Court will set out all of the allegations below and address what may be relevant later in the opinion.

Congress appointed Brett Blanton to be Architect in January 2020, and shortly after, in March 2020, the AOC moved plaintiff and most other staff to remote work because of the COVID-19 pandemic.  Am. Compl. ¶¶ 18, 29.  Plaintiff alleges that he and his employees continued to perform at a high level, but that his "disability-related mobility issues worsened while he worked remotely, resulting in increasingly severe mobility issues."  Am. Compl. ¶¶ 30–31.

As he tells the story, in November 2020, Christine Leonard joined the AOC as the Director of Legislative and Public Affairs.  Am. Compl. ¶ 22.  During the onboarding process, Leonard allegedly asked Erin Courtney, one of her new reports, "why the AOC employed so many military veterans."  Am. Compl. ¶ 24.  The complaint alleges that "Leonard resented men in positions of authority above her in rank and routinely demeaned women who served under her," and "regularly and critically declared to Courtney that she believed there were too many male veterans in executive positions at the AOC."  Am. Compl. ¶¶ 25, 27.  The amended complaint also alleges that Leonard regularly complained about three other AOC employees who were all white male veterans over 40-years-old – General Counsel Jason Baltimore, Chief Financial Officer Johnathan Kraft, and Chief Administrative Officer William O'Donnell – for "their use of military language" and "mansplaining."  Am. Compl. ¶¶ 19, 26.

In January 2021, plaintiff and Architect Blanton allegedly agreed to keep the AOC-OIG in a "remote work posture" until February 2022.  Am. Compl. ¶ 33.  In February 2022, Blanton "formalized a fulltime telework policy for the entire [a]gency."  Am. Compl. ¶ 33.  Plaintiff alleges that, as part of the policy, Blanton approved him "to work remotely on a permanent basis" and "to move away from" the Washington, D.C. area.  Am. Compl. ¶¶ 33–34.

Midway through 2021, the AOC-OIG began investigating Blanton for misuse of a federal vehicle, and the office uncovered evidence that Blanton used his federal vehicle for private purposes. Am. Compl. ¶¶ 36–37. In November 2022, plaintiff released an investigative report detailing the misuse, and, concerned that Blanton would retaliate, plaintiff asked AOC-OIG counsel to draft a remote work policy for AOC-OIG that mirrored the AOC's policy at the time. Am. Compl. ¶¶ 38–39. Plaintiff also moved the decision-making for routine travel and leave requests made by AOC-OIG personnel from AOC to the AOC-OIG's legal and ethics officers. Am. Compl. ¶ 40. Blanton was fired on February 13, 2023. Am. Compl. ¶ 41.

Around the same time, in February 2023, Chief Engineer Chere Rexroat and two Senate staffers, Nicole Kotchwar and Kristin Mollet, allegedly asked plaintiff to investigate the "remote telework arrangement" in place for AOC General Counsel John Baltimore. Am. Compl. ¶ 47. Plaintiff declined to investigate and told them the telework agreement was approved by the AOC and appeared to be compliant with the telework policy issued by former Architect Blanton. Am. Compl. ¶ 47. Plaintiff alleges that Senate Staffer Kotchwar also made multiple requests that he investigate Chief of Staff Peter Bahm, but he declined because she "did not provide any specific allegations," just "often implied that Bahm [did] not do any work." Am. Compl. ¶ 48.

In March 2023, Chief Engineer Rexroat became Acting Architect. Am. Compl. ¶ 44. Plaintiff alleges that Rexroat "ceased communicating" with Chief Executive Officer Kraft, Chief Administrative Officer O'Donnell, General Counsel Baltimore, and Chief of Staff Bahm, and began working more closely with Director of Legislative and Public Affairs Leonard and other congressional staffers. Am. Compl. ¶ 45.

On March 3, 2023, plaintiff published a "Management Advisory" about the investigation into former Architect Blanton. Am. Compl. ¶ 42. Without revealing any names, the advisory

stated that seventeen AOC employees had potential knowledge of Blanton's conduct but failed to notify AOC-OIG. Am. Compl. ¶ 42. Plaintiff did not recommend any disciplinary action for the employees, but he did recommend that all senior AOC employees be "more vigilant about identifying potential violations in the future." Am. Compl. ¶ 43. Senate Staffers Kotchwar and Mollet "often" asked AOC-OIG to investigate the seventeen employees, but plaintiff told them that he would also create a management advisory asking for retraining on compliance instead of investigating. Am. Compl. ¶ 49.

Plaintiff alleges that in the beginning of April 2023, Acting Architect Rexroat asked him to identify the seventeen employees. Am. Compl. ¶ 51. Plaintiff complied, and Rexroat then "fired (offered retirement, termination, or resignation) Kraft, Baltimore, O'Donnell, and Bahm." Am. Compl. ¶ 51. According to plaintiff, "[t]he remaining four female executives were not terminated," even though one, Val Halsberry, was "directly implicated in the list of 17 employees." Am. Compl. ¶¶ 51, 53. "Worried that he was next to be fired as an older white male veteran," plaintiff informed Rexroat that he did not "serve at her pleasure because of the independence of his office." Am. Compl. ¶ 55.

Chief Administrative Officer O'Donnell chose to retire rather than be terminated, and his employees threw an informal retirement party for him. Am. Compl. ¶ 56. Acting Architect Rexroat filed a complaint with the AOC-OIG to investigate O'Donnell and the employees for "gifts violations," but plaintiff dismissed the investigation on the ground that "the allegations were unfounded." Am. Compl. ¶ 56.

In early May 2023, AOC-OIG finalized and published its full-time telework policy. Am. Compl. ¶ 58. Around the same time, Acting Architect Rexroat revoked former Architect Blanton's 2022 policy, and reverted the agency to pre-pandemic rules requiring that employees work in-

person.  Am. Compl. ¶ 59.  Plaintiff alleges that AOC-OIG staff were unaffected by the policy change, but that Rexroat directed AOC employees "to reject [his] travel and leave requests."  Am. Compl. ¶ 59.  Plaintiff further alleges that Rexroat refused to change his duty station after he moved from Virginia to Florida in March 2023, which prevented him from making unilateral travel decisions to get training.  Am. Compl. ¶ 59.

On May 15, 2023, plaintiff told Acting Architect Rexroat that he transferred decision-making power over "many administrative requests" to the AOC-OIG's ethics and legal officer. Am. Compl. ¶ 61.  Plaintiff also told Congress about the change, and the ethics and legal officer "was given approval authorities." Am. Compl. ¶ 61.  Plaintiff then refiled his approvals for remote work, travel, training, leave, and time and attendance, and the officer approved his requests.  Am. Compl. ¶ 61.  Plaintiff has been working remotely from St. Augustine, Florida since August 1, 2023.  Am. Compl. ¶ 61.

In the spring of 2023, plaintiff allegedly began receiving complaints that Acting Architect Rexroat was "causing separation of powers issues" by letting congressional staffers sit in on AOC meetings and set up offices within the AOC.  Am. Compl. ¶ 46.  Plaintiff also received complaints that Rexroat was creating a hostile work environment and violating AOC policies.  Am. Compl. ¶ 46. The AOC-OIG investigated complaints that Rexroat refused to change duty stations for AOC employees, Am. Compl. ¶ 60, and it received a complaint that the agency misused funds for a study evaluating a list of AOC employees "for potential telework eligibility."  Am. Compl. ¶ 74.

On July 6, 2023, plaintiff met with congressional staffers regarding the independence of his office.  Am. Compl. ¶ 62. Plaintiff alleges that the staffers "assailed [him] for not walking the halls of the Capitol in-person," and in response, he said that "his position required no physical presence in the Capitol and that he was able to accomplish his duties remotely."  Am. Compl. ¶ 62.

6

The staffers allegedly "invoked [his] veteran and disability status and implied that he could not work as [Inspector General] due to his disability." Am. Compl. ¶ 63. On July 11, 2023, plaintiff filed a complaint with the Office of Congressional Workplace Rights ("OCWR") alleging that AOC used his disability status against him, recounting the July 6 meeting. Am. Compl. ¶ 64; Ex. 1 to Mot. [Dkt. # 14-1] at 11.[3]

In October 2023, plaintiff discovered that a $2,500 travel reimbursement request he submitted for work-related training was not processed. Am. Compl. ¶ 65.

On November 7, 2023, Acting Architect Rexroat issued a new policy that "severely restricted telework at the AOC." Am. Compl. ¶ 71. Plaintiff alleges that Rexroat "bypass[ed] approval and comment by the AOC-OIG," and that the new policy violated the AOC-OIG's independence and telework policy. Am. Compl. ¶ 72. The next day plaintiff received a letter from the Inspector General Integrity Committee, a body under the Council of the Inspectors General on Integrity and Efficiency that receives and reviews allegations of wrongdoings made against Inspector Generals,[4] notifying him that Rexroat accused him of misconduct. Am. Compl. ¶ 73.

On November 14, 2023, Rexroat told plaintiff that he would be terminated if he did not report to work in person by March 4, 2024. Am. Compl. ¶ 75. Plaintiff responded that he would not be able to perform his duties in person due to his disability, and he filed a request for reasonable accommodation that requested full-time telework. Am. Compl. ¶ 75. Plaintiff alleges that Director

---

3    Plaintiff alleges that he filed the OCWR form on July 13, 2023, Am. Compl. ¶ 63, but the OCWR complaint indicates that it was filed on July 11, 2023. Ex. 1 at 10.

4    The Council of the Inspectors General on Integrity and Efficiency is "an independent entity established within the executive branch to . . . aid in the establishment of a professional, well-trained and highly skilled workforce in the Offices of Inspectors General." *See What is CIGIE?*, Council on the Inspectors General on Integrity & Efficiency (Apr. 28, 2026), https://perma.cc/A6GW-5UGJ.

of Legislative and Public Affairs Leonard and congressional staffers leaked information about his employment situation to multiple publications, and that one outlet published an article titled "Architect of Capitol calls its watchdog back to the office."  Am. Compl. ¶¶ 76–77.

At some point in December 2023, plaintiff asked Rexroat to "delay or grant a stay" of the March 4, 2024 deadline to return to the office so that the reasonable accommodation interactive process could play out.  Am. Compl. ¶ 80.

On January 9, 2024, plaintiff sent AOC's human resources department a request to update his salary to match the Office of Personnel Management's salary schedule for the 2024 fiscal year. Am. Compl. ¶¶ 65, 68–70.  He alleges that human resources "ignored" his request.  Am. Compl. ¶ 70.

On January 10, plaintiff provided the agency with a letter from his medical provider recommending telework, and a summary of benefits letter from the Department of Veterans Affairs stating that he had a "100% disability rating."  Am. Compl. ¶ 81.  He asked Acting Architect Rexroat to delay or stay the March 4, 2024 deadline again, but she did not respond.  Am. Compl. ¶ 86.

In February 2024, Rexroat stepped down and AOC Chief of Operations Joe Di Petro became Acting Architect.  Am. Compl. ¶ 87–88.  Di Petro stayed the in-person return deadline, and he approved plaintiff's $2,500 travel reimbursement and salary adjustment.  Am. Compl. ¶¶ 70, 88.  Plaintiff allegedly "received apologies from [human resources] staff who were told that Rexroat had held up the approvals to pay him." Am. Compl. ¶ 70.

The AOC then requested further medical documentation from plaintiff regarding his disability.  Am. Compl. ¶ 82.  His medical provider sent a letter detailing plaintiff's conditions,

8

work limitations, and the frequency of his medical appointments on February 12, 2024, and another letter with additional information on March 31.  Am. Compl. ¶¶ 83–85.

In June 2024, Congress appointed Thomas Austin to be the new Architect.  *See* Am. Compl. ¶ 89.  Plaintiff alleges that on July 8, he attended a meeting with Austin and Di Petro during which Austin told plaintiff that he could have plaintiff removed from his position without reason if he gave Congress thirty days' notice.  Am. Compl. ¶¶ 89–91.  Austin told him that he was "taking control" of plaintiff's time, attendance, travel, training, and leave requests, that he wanted plaintiff back in the office full time, and that he would rule on his reasonable accommodation request quickly.  Am. Compl. ¶ 91.  The next day, plaintiff sent an email to Austin and an AOC human resources representative raising concerns that Austin was retaliating against him.  Am. Compl. ¶ 92.

On July 26, plaintiff received a letter from the AOC Diversity Inclusion and Dispute Resolution Office ("DI/DR") responding to his accommodation request.  Am. Compl. ¶ 94.  It offered plaintiff a sixty-day period, from July 28 to September 26, during which he could split time working remotely and in-person, so long as he worked in-person one week per pay period.  Am. Compl. ¶ 94.  The response enumerated the "in-person essential functions" of plaintiff's position, including:  personally inspecting job sites, the status of office buildings, the state of campus grounds, and observing employee compliance with agency regulations; conducting in-person meetings; and conducting in-person briefings with the Architect and other staff.  Am. Compl. ¶¶ 94–96.

Plaintiff claims that his position did not require anything "that would take him away from his office."  Am. Compl. ¶ 96.  He alleges that any building or grounds inspection was the Chief Engineer's responsibility, and that his staff provided weekly updates with the results of audits,

investigations, and evaluations. Am. Compl. ¶¶ 95–96, 98. He also alleges that his position never required meetings with the Architect or Congress, and that he initiated monthly meetings – held both in-person and virtually – to keep all parties fully informed. Am. Compl. ¶ 97.

On July 29, plaintiff responded to the letter, asking the agency to reconsider. Am. Compl. ¶ 100. He "explained that the duties listed in [the] letter [were] not duties included in the IG position description," and he "raised concerns that this letter [was] a further act of retaliation and discrimination." Am. Compl. ¶ 100.

From August 3 through August 8, plaintiff returned to work in-person. Am. Compl. ¶ 101. On August 12, he filed another claim with the OCWR, charging the AOC with (1) race-based discrimination in violation of Title VII; (2) sex-based discrimination in violation Title VII; (3) discrimination based on veteran-status in violation of Uniformed Services Employment and Reemployment Rights Act; (4) discrimination based on age in violation of the Age Discrimination in Employment Act; (5) discrimination based on disability in violation of the Rehabilitation Act; (6) failure to accommodate in violation of the Rehabilitation Act; and (7) retaliation for protected activity in violation of the Rehabilitation Act. Ex. 2 to Mot. [Dkt. # 14-2] at 9, 28–34.

On August 14, Austin emailed plaintiff that he expected plaintiff to appear in-person at the AOC's monthly meeting, one-on-one meetings with the Architect, senior staff meetings, and AOC-OIG entrance and exit conferences. Am. Compl. ¶¶ 102–103. Plaintiff alleges many of these meetings had been virtual since 2020, and that Austin himself did not attend the virtual senior staff meetings. Am. Compl. ¶¶ 102, 104–05. He further alleges that Austin questioned plaintiff's staff as to why plaintiff did not attend an OIG meeting, when plaintiff had received prior approval to attend a different training on the same date. Am. Compl. ¶ 106.

On September 1, 2024, the AOC-OIG office received a complaint that Rexroat, who was not Acting Architect anymore but still worked at AOC, "was consistently out of office on [telework] and falling short of the number of days in the office that she requires of other employees per her directive." Am. Compl. ¶ 108. Plaintiff allegedly found out that Rexroat had a "reasonable accommodation and [was] in the process of reapplying for telework." Am. Compl. ¶ 108.

On September 26, 2024, the day plaintiff's temporary accommodation period ended, a specialist from the AOC's DI/DR emailed him to solicit his input on the accommodation plan. Am. Compl. ¶ 109. Plaintiff responded with a letter stating that the agency had previously mischaracterized the essential job functions of his position, that the temporary accommodation was ineffective, and that he had been successfully performing his job remotely. Am. Compl. ¶¶ 109–10. On October 10, plaintiff sent another letter to the AOC from his medical provider recommending full-time telework, as well as a litigation hold letter. Am. Compl. ¶¶ 111–12.

Plaintiff filed the instant suit on October 17, 2024. The next day, the AOC issued its final determination denying his reasonable accommodation request. Am. Compl. ¶ 114. The letter stated that plaintiff's supervisor identified essential functions that required in-person work, and that the DI/DR lacked authority to address plaintiff's concern that those essential functions were not actually part of his duties as Inspector General. Am. Compl. ¶¶ 114–15.

On October 23, plaintiff informed the DI/DR office that he intended to continue following the temporary accommodation plan that had ended on September 26 "until he was no longer physically able to do so," and that he had "filed his claims in district court." Am. Compl. ¶ 116. The AOC responded that it could not accommodate plaintiff in his current position because he was no longer able to perform the essential functions of the job, and it gave him until October 25 to decide whether he wanted to pursue reassignment to a different position. Am. Compl. ¶ 117.

Plaintiff agreed to a reassignment search, and the AOC initiated a thirty-day search. Am. Compl. ¶ 119.

On November 5, plaintiff wrote to the AOC Chief Human Capital Officer Teresa Bailey, requesting a review of the duties Architect Austin and the DI/DR claimed were essential job functions for the Inspector General position. Am. Compl. ¶ 120. Bailey responded to plaintiff's letter on November 22:

> Your supervisor is in the best position to determine the essential functions of your position. Although the position description does not specify that your presence on-site is required (this requirement is generally not delineated in AOC position descriptions for non-wage grade positions), the vacancy announcement under which you applied specified the location of the positions as Washing[ton], D.C., and your supervisor has the authority to determine where and how the essential work of your position [is] to be performed. . . . [T]he Human Capital Management Division has not determined that the duties identified by your supervisor are inaccurate.

Am. Compl. ¶ 123.

On December 2, the AOC informed plaintiff that the reassignment search did not result in any positions for which plaintiff would qualify. Am. Compl. ¶ 124. On December 3, Architect Austin notified plaintiff that he would be terminated. Am. Compl. ¶ 125. The letter from the AOC stated, "Your AOC IG responsibilities require your on-site/in-person leadership and oversight as well as requiring you to participate in meetings and briefings with Congressional Oversight, the Architect, AOC staff and OIG staff." Am. Compl. ¶ 126.[5]

---

5    Plaintiff alleges that he filed two other OCWR complaints with the agency on November 17, 2024 and December 17, 2024, Am. Compl. ¶ 7, but neither of those complaints have been provided to the Court by the parties.

**STANDARD OF REVIEW**

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (rule 12(b)(6) case); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (rule 12(b)(1) case).

**A. Subject Matter Jurisdiction**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555,

14

and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608. The Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

The Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. § 1311 *et seq.*, extends the protections of Title VII, the ADEA, the Rehabilitation Act, and portions of USERRA to employees of the legislative branch. 2 U.S.C. §§ 1301–02, 1311(a)(1)–(3), 1316. The parties agree that plaintiff is a "covered employee" within the meaning of the CAA, and that the Architect of the Capitol is an "employing office" that is subject the statute's requirements. *Id.* §§ 1301(a)(3)(F), (a)(9)(D).

The amended complaint consists of seven claims:

- ▪ Count One alleges that the AOC discriminated against plaintiff on the basis of race in violation of Title VII;

15

- Count Two alleges that the AOC discriminated against plaintiff on the basis of sex in violation of Title VII;

- Count Three alleges that the AOC discriminated against plaintiff on account of his veteran status in violation of USERRA;

- Count Four alleges that the AOC discriminated against plaintiff on the basis of age in violation of the ADEA;

- Count Five alleges that the AOC discriminated against plaintiff on account of his disability in violation of the Rehabilitation Act;

- Count Six alleges that the AOC refused to accommodate plaintiff's disability in violation of the Rehabilitation Act; and

- Count Seven alleges that the AOC retaliated against plaintiff for engaging in activity protected by law in violation of the Rehabilitation Act.

Am. Compl. ¶¶ 129–90.

Defendant does not challenge the failure to accommodate claim, but it has moved to dismiss the rest of the complaint in part on several grounds:  (1) plaintiff failed to exhaust his administrative remedies with respect to some of the discrete discriminatory allegations; (2) the complaint fails to allege any inference of discriminatory animus; (3) to the extent that plaintiff is attempting to bring a cause of action for hostile work environment, the allegations fail to state a claim as a matter of law; and (4) the discrimination and retaliation claims under the Rehabilitation Act are duplicative of the failure to accommodate claim.  Opp. at 10.

## I.   Some of the discriminatory allegations that underlie Counts One through Five are unexhausted and therefore not actionable as grounds for the discrete claims.

Defendant has moved to dismiss as unexhausted:  (1) any allegations of discrete discrimination or retaliation premised on the leaking of plaintiff's disability status in July 2023, and (2) any discrete acts that took place before February 14, 2024, which include:

- Then-Acting Architect Rexroat's direction "to reject [plaintiff's] travel and leave request" and her refusal to change his duty station in May 2023.  Am. Compl. ¶¶ 58–59.

16

- Plaintiff's discovery in October 2023 that his $2,500 travel reimbursement request for work-related training was not processed. Am. Compl. ¶ 65.

- The imposition of the in-person work requirement in November 2023 when then-Acting Architect Rexroat told plaintiff that he would be terminated if he did not report to work in-person. Am. Compl. ¶ 75.

- The leak of plaintiff's employment status to the media in November 2023 after Rexroat told him to return to work. Am. Compl. ¶¶ 76–77.

- Rexroat's complaint to the Inspector General Integrity Committee in November 2023 that AOC-OIG's full-time telework policy presented a conflict of interest for the AOC-OIG. Am. Compl. ¶ 73.

Mot. at 9.

Although the CAA incorporates the protections of other federal statutes, "it establishes its own comprehensive administrative regime," *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009), and it outlines the process that an employee must follow before bringing a claim in federal court. 2 U.S.C. §§ 1361(d), 1401(b)(1), 1408(a). First, the employee must file a claim with the Office of Congressional Workplace Rights that "describe[s] the facts that form the basis of the claim and the violation that is being alleged" within 180 days of the alleged violation. *Id.* § 1402(a)(1)–(2), (d). The employee then has two options: (1) file a civil action in federal court "with respect to the violation alleged in the [OCWR] claim" within 70 days of filing the claim, or (2) await an OCWR hearing officer's determination following a preliminary review of the claim. *Id.* § 1401(b)(1)–(3). If the employee chooses the second option and the hearing officer determines no actionable claim exists, the employee must file any action in federal court within 90 days of receiving written notice from the officer in order to seek judicial relief. *Id.* § 1401(b)(4).

In this case, plaintiff filed his first OCWR claim regarding the revelation of information concerning his disability to Congress on July 11, 2023. Ex. 1 at 10–12. There are no allegations

17

that plaintiff sought an OCWR hearing, so he was required to file any claim based on that action in federal court by September 19, 2023. The instant suit was filed 464 days later, on October 17, 2024, so the allegations related to the July 2023 leak are untimely and not actionable for purposes of plaintiff's discrimination claims. The disability discrimination claim in Count Five is based in part on the same July 2023 leak, *see* Am. Compl. ¶ 169 ("The Agency discriminated against Plaintiff when it used information in Plaintiff's employee file to leak information regarding his disability to third party congressional and senate staffers . . ."), so the Court will also dismiss that portion of the claim as unexhausted.

The same rule applies to the alleged events that took place before February 14, 2024. Plaintiff filed his second OCWR claim on August 12, 2024, Ex. 2 at 9, so the only timely allegations are the ones that occurred within the prior 180 days, that is, between February 14 and August 12, 2024. Thus any claims arising out of events that occurred before those dates are unexhausted and cannot serve as the basis for the discrimination or retaliation claims.

Plaintiff agrees in his opposition that the challenged allegations were unexhausted, but he maintains that he may still use those allegations as "background evidence" to support the allegations that are timely. Opp. at 8. While that is a correct statement of the law, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), and the Court is not excluding the use of evidence of those events for that purpose based on the time limits in the CAA, whether those facts are relevant and admissible under the Federal Rules of Evidence is a question to be determined much later in these proceedings.

## II.    The race, sex, veteran-status, and age discrimination claims will be dismissed because the allegations fail to show discriminatory animus.

Counts One, Two, Three, and Four allege discrete discrimination claims under Title VII, the ADEA, and USERRA. Am. Compl. ¶¶ 129–62.

18

Title VII, the ADEA, and USERRA all protect employees of the federal government from discrimination based on certain characteristics.  Title VII states that, "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C.A. § 2000e-16(a).  The ADEA makes it "unlawful for an employer . . . to . . . discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  And USERRA provides that, "A person who . . . has performed . . . service in a uniformed service shall not be denied . . . any benefit of employment by an employer on the basis of that . . . service[.]"  38 U.S.C. § 4311(a).

In accordance with the language of the statutes, the "two essential elements" necessary to state a discrimination claim under Title VII and the ADEA are that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, [or] age . . . ."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), citing 42 U.S.C. § 2000e–16(a) and 29 U.S.C. § 621.  Similarly, to state a claim under USERRA, a plaintiff must allege that he was subject to an adverse employment action, and that his uniformed service was a "motivating factor" in that action.  38 U.S.C. § 4311; *see Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (explaining that if an employer "performs an act motivated by antimilitary animus that is intended . . . to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA").

The discrimination claims are all based on the same actions.  Counts One, Two, and Three allege that the agency engaged in race, sex, and veteran-status discrimination "when it failed to engage in the interactive reasonable accommodation process," "denied [plaintiff's] reasonable accommodation," "altered [plaintiff's] job duties and responsibilities," and "terminated his employment."  Am. Compl. ¶¶ 134, 143, 150–51.  Count Four does not specify the discriminatory

actions, but it alleges that "AOC's decision to discriminate against [plaintiff] was based on his age." Am. Compl. ¶ 159.

All of the claims fail, though, because the complaint does not contain allegations sufficient to show race-based, sex-based, veteran-status-based, or age-based animus behind the actions related to his accommodations or job status.  Plaintiff points to the allegations related to Acting Architect Chere Rexroat and Director of Legislative Affairs Christine Leonard to support his claims, including:  Leonard's alleged statement in 2022 that there were "too many white male veterans" at the agency; Rexroat's 2023 termination of Kraft, Baltimore, O'Donnell, and Bahm; Rexroat's May 2023 revocation of the agency's telework policy; and Rexroat's delay in considering plaintiff's leave, travel, salary, and change of duty requests throughout 2023.  Opp. at 10–13.  But neither Rexroat nor Leonard were responsible for any of the discriminatory actions underlying the claims; it was Architect Austin who is alleged to have handled and denied plaintiff's accommodation request, and who "altered" plaintiff's job duties during that process for allegedly discriminatory reasons.  Am. Compl. ¶¶ 89–91, 94–96, 102–03, 106, 120, 125.

Rexroat stepped down from the Acting Architect position in February 2024, and Austin became Architect in June 2024.  Am. Compl. ¶¶ 87–89.  Plaintiff received the letter that allegedly altered the essential functions of his position on July 26, 2024, his accommodation request was denied October 18 of that year, and he was terminated on December 3.  Am. Compl. ¶¶ 94–96, 114, 125.  There are no allegations connecting Austin's actions to Rexroat or Leonard at all, and notwithstanding its considerable detail, the amended complaint is devoid of any factual allegations that would support a plausible inference that Austin harbored animus against plaintiff because of his race, sex, veteran-status, or age.

Plaintiff maintains that the complaint states a claim of sex discrimination because it alleges that the agency did not discipline female employees Rexroat, Leonard, and Hasberry, even though they engaged in conduct "similar" to plaintiff. Opp. at 10. In the absence of direct evidence, plaintiffs have been permitted to show that an employer acted with sex-based animus by "suggesting that the employer treated other employees of a different . . . sex . . . more favorably in the same factual circumstances." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008), citing 1 Lex K. Larson, Emp. Discrimination § 8.04, at 8–66 (2d ed. 2007). To do so, the plaintiff must demonstrate "that all of the relevant aspects of [their] employment situation[s] were nearly identical." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016), quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.*, quoting *Burley*, 801 F.3d at 290.

The complaint here does not contain the allegations necessary to show that the same, or even similar circumstances pertained to plaintiff and the three female employees. The agency allegedly terminated him because it considered in-person work to be essential to the role of Inspector General, he was no longer willing or able to work in-person, and the agency would not accommodate him through remote work. Am. Compl. ¶ 117. There are no allegations that Leonard or Hasberry requested or received reasonable accommodations involving remote work or anything else, or that they were involved in any comparable situation.

As to Rexroat, the only allegations are that on September 1, 2024, in the course of his work as Inspector General, plaintiff received a complaint that she was "consistently out of office on

21

[telework]" and "falling short of the number of days in the office she require[d] of other employees." Am. Compl. ¶ 108. At that point, she had returned to the position of Chief Engineer. He also alleges that he learned that she had a reasonable accommodation and was in the process of reapplying for telework. Am. Compl. ¶ 108. There are no allegations or other indication of how plaintiff's job as Inspector General compared to Rexroat's role as Chief Engineer, how plaintiff's reason for needing reasonable accommodation compared to Rexroat's, or whether the reasonable accommodation decisions were made by the same individuals within the AOC. Plaintiff's allegations are too sparse and vague to support a plausible inference their situations were sufficiently comparable to state a claim for sex-based discrimination against him.

Therefore, because the claims lack factual allegations sufficient to support a plausible inference that plaintiff's accommodation was denied or that he was terminated based on his race, sex, age, or veteran-status, the Court will dismiss Counts One, Two, Three, and Four without prejudice for failure to state a claim.

### III.    Counts Five, Six, and Seven will survive, but Count Seven fails to allege a retaliatory hostile work environment claim.

Counts Five, Six, and Seven are claims under the Rehabilitation Act. Count Five alleges that the agency discriminated against plaintiff on the basis of disability by failing to engage in the interactive process, denying his reasonable accommodation, altering his job duties and responsibilities, and terminating his employment. Am. Compl. ¶ 171. Count Six alleges the agency "failed to accommodate [p]laintiff's reasonable accommodation request," "denied him reasonable accommodation," and "terminated his employment." Am. Compl. ¶¶ 180–81. And Count Seven alleges that the agency retaliated against plaintiff for exercising his rights under the Rehabilitation Act by subjecting him to a hostile work environment, failing to accommodate him, and terminating his employment. Am. Compl. ¶¶ 184–89.

The agency first argues that the disability and retaliation claims under Counts Five and Seven are effectively the same as the failure to accommodate claim under Count Six, and therefore, they should be dismissed.  It is true that other courts in this district have observed that duplicative claims are ones "that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available."  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010), citing *McGee v. District of Columbia,* 646 F. Supp. 2d 115, 121–22 (D.D.C. 2009).

But none of the claims are "identical."  The Rehabilitation Act incorporates the protections of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, and the ADA provides that, "No covered entity shall discriminate against a qualified individual on the basis of disability . . . ."  42 U.S.C. § 12112(a).  The statute does specify that "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A), but Count Five's discrimination claim is based on a wider range of conduct than Count Six's failure to accommodate claim.  Count Six alleges that the agency failed to accommodate plaintiff, and Count Five alleges that it discriminated against plaintiff by "alter[ing] his jobs duties and responsibilities" and "terminat[ing] his employment."  So those two counts are not identical.

The retaliation claim is also not identical.  Separate from the provision prohibiting discrimination based on disability, the ADA bars retaliation "against any individual because such individual has opposed any act or practice made unlawful by [the statute] or because such individual made a charge . . . under this chapter."  42 U.S.C. § 12203(a).  The claim that the agency retaliated against plaintiff because he filed an OCWR complaint involves different elements and

additional factual allegations than the ones underlying the failure to accommodate claim. Therefore, Count Seven is also not duplicative.

Defendant also moved to dismiss the portions of the discrimination and retaliation claims based on the July 2023 leak of plaintiff's disability, the November 2023 in-person work requirement, the Inspector General Integrity Committee investigation, and the delayed approval of plaintiff's employment-related requests on the grounds that those actions are not adverse or because they happened before plaintiff's OCWR complaint and there would be no causality.  Mot. at 13–22.  The Court has already dismissed those allegations as unexhausted, and further, the amended complaint specifies that the claims are based on the agency's failure to engage in the interactive process, denial of plaintiff's reasonable accommodation, alteration of his job duties and responsibilities, and termination of his employment.  Am. Compl. ¶¶ 171, 184–89.  Defendant does not challenge those allegations on their face, so the discrimination and retaliation claims based on those will move forward.

But the Court will dismiss the portion of Count Seven that pleads a retaliatory hostile work environment claim.  The Court notes at the outset that the complaint does not specifically enumerate a hostile work environment claim.  *See* Am. Compl. ¶¶ 129–190.  Count Seven, though, includes an allegation that the agency subjected plaintiff "to a hostile work environment" after he exercised his rights under the Rehabilitation Act.  Am. Compl. at 2; Am. Compl. ¶ 189.  Given that allegation and the fact that both parties have addressed hostile work environment claim, *see* Mot. at 27–30; Opp. at 19–21, the Court will assess that portion of Count Seven as a retaliatory hostile work environment claim.

"A plaintiff may bring a special type of retaliation claim based on a hostile work environment by alleging a series of individual acts that may not be actionable on their own but

24

become actionable due to their cumulative effect." *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020) (internal quotation marks and alterations omitted). The individual acts must be "adequately linked such that they form a coherent hostile environment claim, and of such severity or pervasiveness as to alter the conditions of employment and create an abusive working environment." *Id.* (internal quotation marks and alterations omitted). When assessing whether the acts were severe and pervasive enough, courts consider "the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (internal quotation marks omitted). The conduct "must be extreme to amount to a change in the terms and conditions of employment," and "both objectively and subjectively offensive" such that "a reasonable person would find [the workplace] hostile or abusive." *Faragher v. Boca Raton*, 524 U.S. at 774, 787–88 (1998).

Plaintiff argues that several of the factual allegations in the complaint amount to an actionable hostile work environment, including: (1) then-Acting Architect Rexroat's statement that plaintiff must report to work in-person by March 4, 2024, or face termination; (2) her delayed approval of plaintiff's various administrative requests; (3) the meeting in which Architect Austin threatened termination if plaintiff did not return to work in-person; (4) the "added duties that were not in the [Inspector General's] job description"; (5) Austin's email stating his expectations for in-person meetings; (6) Austin's question to plaintiff's staff regarding his absence from a conference despite prior approval; (7) the denial of plaintiff's requests for accommodation; (8) "unplanned check-in meetings"; and (9) plaintiff's termination prior to the conclusion of the reassignment search. Opp. at 20–21; Am. Compl. ¶¶ 70, 75, 86, 88, 91, 93–99, 101–03, 106.

25

The Court notes that several of these events occurred before the protected activity that plaintiff claims prompted hostility.  But in any event, the allegations fail to state a hostile work environment claim.  First, the allegations that plaintiff relies on are the same discrete acts underlying his other claims, and "as a general matter[,] courts in this Circuit frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013), quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007) (quotation marks omitted).  Further, plaintiff has not alleged any threatening, humiliating, or other offensive conduct that supports an inference that his workplace was "permeated with discriminatory intimidation, ridicule, and insult."  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998), quoting *Harris*, 510 U.S. at 21.

The gravamen of plaintiff's complaint is that he needed the reasonable accommodation of a telework position, that he had and could perform the functions of an Inspector General with that accommodation, and the agency's inflexibility and his subsequent termination violated the Rehabilitation Act.  That claim has not been challenged as insufficient on its face, and it will be moving forward.  But the series of events in that chronology do not give rise to a hostile work environment claim as well.  The conclusory statement that plaintiff suffered "mental anguish," Am. Compl. ¶ 128, is not enough to cure the absence of the requisite severity and pervasiveness.

Therefore, the portion of Count Seven that pleads a retaliatory hostile work environment claim is dismissed without prejudice.

## CONCLUSION

For the reasons stated above, defendant's partial motion to dismiss [Dkt. # 14] is **GRANTED IN PART AND DENIED IN PART**.  Counts One, Two, Three, and Four are **DISMISSED** without prejudice.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  July 23, 2026